# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**REBECCA I. HARP**
        **Plaintiff,**

    v.                                                  **Case No. 20-C-1743**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

The Social Security Administration ("SSA") awarded disability insurance benefits to plaintiff Rebecca Harp. Several years later, after learning that plaintiff had been earning significant amounts working as a care provider, which she failed to report, the SSA reopened the matter. Following a hearing, an Administrative Law Judge ("ALJ") determined that plaintiff was not entitled to benefits because, during the period at issue, she engaged in "substantial gainful activity." Proceeding pro se, plaintiff seeks judicial review of this decision.

## I. LEGAL STANDARDS

### A. Disability Standard

A person is "disabled" if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1). Disability is determined pursuant to a five-step test, under which the ALJ asks whether: (1) the claimant is working, i.e., engaging in substantial gainful activity ("SGA"); (2) the claimant has a severe impairment or combination of

impairments; (3) the claimant's impairment meets or equals one of the impairments deemed presumptively disabling under the agency's Listings; (4) the claimant's residual functional capacity ("RFC") leaves her unable to perform her past relevant work; and (5) the claimant is unable to perform any other jobs existing in significant numbers in the national economy. Butler v. Kijakazi, 4 F.4th 498, 501 (7th Cir. 2021).

The test applies sequentially. Accordingly, a claimant engaging in SGA will be found not disabled regardless of her medical condition. 20 C.F.R. § 404.1520(b). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work activity done "for pay or profit." 20 C.F.R. § 404.1572(b). The regulations set forth income guidelines for determining whether work constitutes SGA. See 20 C.F.R. § 404.1574.

The regulations further provide that a favorable decision on a disability claim may be reopened at any time if it was "obtained by fraud or similar fault." 20 C.F.R. § 404.988(c)(1). Similar fault is present when the claimant either knowingly makes an incorrect or incomplete statement or knowingly conceals information that is material to the determination. 42 U.S.C. § 404(u)(2).

**B.  Standard of Review**

A reviewing court will uphold an ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and contains an accurate and logical bridge from the evidence to conclusions. Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020). Substantial evidence is not a high threshold, as it means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Prill v. Kijakazi, 23 F.4th 738, 746 (7th Cir. 2022). The court will not, under this deferential standard, re-weigh the evidence or substitute

its judgment for that of the ALJ. Id. Additionally, the court will generally uphold an ALJ's reasoned judgment on how much evidence to obtain, even when the claimant lacks representation. Nelms v. Astrue, 553 F.3d 1093, 1098 (7th Cir. 2009).

## II. FACTS AND BACKGROUND

Plaintiff applied for benefits in February 2012, alleging a disability onset date of May 18, 2011. (Tr. at 103, 426.) The agency denied her application initially (Tr. at 101, 140) and on reconsideration (Tr. at 114, 151), but following an August 4, 2015, hearing at which plaintiff amended the alleged onset date to August 20, 2014, when she turned 55 (Tr. at 78-99, 260), in a decision dated August 19, 2015, an ALJ found her disabled pursuant to Grid Rule 202.06 based on a light RFC (Tr. at 128-36).

In January 2019, the SSA sent plaintiff a letter indicating that it was conducting a review to make sure she was still disabled. (Tr. at 640.) The agency discovered that during the disability period plaintiff earned money as a care provider for her disabled daughter pursuant to the State of Wisconsin's IRIS and Family Care programs. (Tr. at 434-42, 680-83, 718.) Plaintiff failed to report these payments to the SSA. Plaintiff did not deny receiving the payments but advised that she did not believe she needed to report them because they were exempt from federal income taxes.[1] (Tr. at 642-43.) The agency initially suspended her benefits but later resumed payments following her request for reconsideration. (Tr. at 570, 698; R. 39-1.)

On October 8, 2019, an ALJ advised plaintiff that he was reopening the original decision

---

[1] The SSA-OIG referred the matter to the United States Attorney's Office for possible criminal charges. The government offered to resolve the matter with a plea to an information. It appears plaintiff rejected the offer, and the government did not thereafter obtain an indictment. (Tr. at 651-53.)

3

on her 2012 application. The notice explained:

> Questions pertaining to your work activity have come to the attention of the Social Security Administration that need to be examined under 20 CFR § 404.988(c)(1), which could or could not lead to a revision of the decision finding you disabled. Enclosed is the evidence that I have used as the basis for my decision to reopen your claim. Specifically, there is evidence that you have been working above the allowable limits since July 2014. By reopening your Title II disability claim, time will be set aside for you to tell the ALJ about your case.

(Tr. at 261.) The ALJ attached to the notice 18 pages of records detailing plaintiff's earnings during the relevant period. (Tr. at 262-78.)

On March 10, 2020, plaintiff appeared pro se for a hearing before an ALJ. (Tr. at 24.) At the outset of the hearing, the ALJ explained that plaintiff had to the right to be represented, and that the case had been reopened based on evidence of work activity since plaintiff had been deemed disabled. (Tr. at 38.)

The ALJ asked plaintiff about her work history, and plaintiff testified that she worked as a bus driver from 1998 to 2012, when she became disabled due to a back impairment. (Tr. at 39.) Plaintiff explained that she voluntarily placed her disabled daughter into the foster care system because she could not physically take care of her, but plaintiff later took the child back based on suspected abuse. (Tr. at 44.) Plaintiff testified that her daughter lived in her home, but plaintiff did not physically care for her (Tr. at 44-45); she merely provided her daughter with a home, with another person providing care (Tr. at 46).

The ALJ asked why, if she provided no care, plaintiff received income and was listed as an employee of the care agency. Plaintiff responded that was the way the agency had their system set up. (Tr. at 47.) She testified that when her daughter's other aide left at night her daughter was there with her, but they were both in bed or watching TV. (Tr. at 47-48.) Plaintiff stated that she tried to change her daughter's diaper at night if necessary, but most times that

4

was not needed until the other aide arrived in the morning. Plaintiff explained that her daughter "cannot be left alone so it's me and her in the home so I bill for those hours instead of hiring someone else to come in and that is the way that I have to in order to get the payment." (Tr. at 48.) She testified that she used to the money to take care of her daughter. (Tr. at 48-49.)

The ALJ noted that earnings records showed plaintiff received over $15,000 in 2015, $46,000 in 2016, $49,000 in 2017, and $63,000 in 2018. The ALJ asked what plaintiff was getting paid for and how they determined how much to pay her. (Tr. at 51.) Plaintiff did not directly respond, instead stating that under the law she did not have to report the income for tax purposes. (Tr. at 52.) She also stated that she just supervised her daughter and made sure she was okay; they normally watched TV. (Tr. at 53.) However, plaintiff did not deny receiving over $63,000 in 2018. (Tr. at 54.)

The ALJ asked plaintiff if she remembered, at the time of her initial award, receiving a statement of her responsibilities in terms of reporting any income she received. (Tr. at 57.) Plaintiff stated that she was represented by a lawyer at that time (Tr. at 57), and that she was not receiving income when she appeared in front of the first ALJ (Tr. at 58).[2] When the ALJ pressed the point, plaintiff testified that "I didn't report it because I felt like it was nothing to report because I'm not working and when I was doing foster care stuff, I didn't report that to anybody and the – and I got the money and so I equated it as the same thing and if that was the wrong thing to do, I apologize." (Tr. at 58-59.) She also stated that the agency paying her was not reporting it. (Tr. at 59.)

Plaintiff brought as witnesses two aides who had assisted her daughter. (Tr. at 60.)

---

[2]Plaintiff's previous hearing occurred in August 2015. The ALJ later found that plaintiff worked at the SGA level as of (at least) August 2014. (Tr. at 14, 269, 684.)

5

After confirming that they would both testify as to what they did and what plaintiff did not do, the ALJ indicated she did not need two witnesses to say essentially the same thing. Plaintiff presented testimony from the current aide, Nakita Neal. (Tr. at 61.) Neal testified she was in the home eight hours per day, bathing, clothing, feeding, and exercising plaintiff's daughter. (Tr. at 62-63, 67.) She stated that plaintiff did not assist. (Tr. at 64.) Neal also did not see plaintiff clean her house. (Tr. at 67.)

On April 3, 2020, the ALJ issued an unfavorable decision. (Tr. at 8.) The ALJ determined that plaintiff last met the insured status requirement for disability insurance benefits on September 30, 2016. (Tr. at 13.) The ALJ then found that, through September 30, 2016, plaintiff engaged in SGA during the periods of August 2014 through February 2015 and November 2015 through September 2016. (Tr. at 14.) The ALJ explained that plaintiff received payments through the IRIS program for the care of her disabled daughter, with earnings above the SGA level during the identified periods. Specifically, plaintiff earned $6107 in August 2014, $6096 in September 2014, $4434 in October 2014, $4199 in November 2014, and $6254 in December 2014, above the 2014 SGA limit of $1070/month. She earned $4915 in January 2015, $3959 in February 2015, $1390 in November 2015, and $2629 in December 2015, above the 2015 SGA limit of $1090/month. And she earned $3962 in January 2016, $3148 in February 2016, $4032 in March 2016, $4397 in April 2016, $3982 in May 2016, $5140 in June 2016, $4152 in July 2016, $3812 in August 2016, and $3351 in September 2016, above the 2016 SGA limit of $1130/month. The ALJ further noted that plaintiff's earnings continued to exceed SGA levels after the relevant period: over $40,000 in 2017 and $60,000 in 2018. (Tr. at 15, citing Tr. at 261-79.) At the hearing, plaintiff admitted that she continued to be paid by IRIS. (Tr. at 14.)

6

Plaintiff failed to report these earnings to the SSA, but she argued that she should not be held at fault because the IRIS program should have reported them. Alternatively, she argued that she did not know she had to report them to the SSA because she did not need to report them to the IRS. The ALJ rejected these arguments, noting that the duty to report earnings to the SSA falls on the claimant, not the employer, and that the reporting requirements of one agency are not the same as the requirements of another. The ALJ found that plaintiff was informed about her duty to report earnings to the SSA. (Tr. at 14.)

Plaintiff also claimed that, although she received payments from IRIS, she did not perform any actual work; she stated that she simply provided a home for her daughter and was present when a health aide was not. (Tr. at 14-15.) In support of this argument, plaintiff presented testimony from one of her daughter's aides, who stated that plaintiff did nothing to care for her daughter. The ALJ rejected this argument as well. The record showed that plaintiff submitted an application for employment as a care giver, filled out a W-4 form, submitted an employee direct deposit authorization for her paychecks, submitted to an employee eligibility verification, was hired, and then began submitting payroll time-sheets documenting her work hours. (Tr. at 15, citing Tr. at 651-53.)

The ALJ further noted that the IRIS program does not pay a person for simply being present. Rather, the program pays for "non-medical tasks" and refers to plaintiff's position as "care provider." Plaintiff was aware that the program does not pay family members for services that a relative would normally provide another family member as a matter of course in the usual relationship among family members. (Tr. at 15, citing Tr. at 683.) The record also contained a 2016 court decision which showed that plaintiff knew that hours of work reported should

7

reflect hours of work performed.³ (Tr. at 15, citing Tr. at 717-23.) While the witness plaintiff presented may not have seen plaintiff perform any care for her daughter, she was not present during the hours that IRIS paid plaintiff to act as the care provider and perform non-medical tasks. (Tr. at 15.)

Finally, plaintiff argued that the money she received from IRIS was used to provide medical supplies and equipment for her daughter. However, the ALJ found it irrelevant how plaintiff spent her earnings. (Tr. at 15.)

> In sum, the evidence shows that the claimant submitted an employment application to IRIS, is deemed to be a care provider of nonmedical tasks, and she knew that hours billed should be for work performed. The combination of these factors weighs against her position that she is paid but does not do anything. Thus, her work is both substantial and gainful. In addition, the claimant knew about her duty to report her earnings to SSA while receiving Social Security Disability benefits, but she failed to report her earnings. Because there is no continuous 12-month period in which the claimant did not engage[] in SGA prior to the date last insured, it is not necessary for the undersigned to proceed to the remaining steps of the sequential evaluation process.

(Tr. at 15.) The ALJ concluded that plaintiff was not under a disability at any time from August 20, 2014, the amended alleged onset date, through September 30, 2016, the date last insured. (Tr. at 15.)

On September 30, 2020, the Appeals Council denied plaintiff's request for review of the

---

³In that decision, the Wisconsin court of appeals upheld a 2014 administrative decision dis-enrolling plaintiff's daughter from a state program providing assistance to participants with disabilities. (Tr. at 717-23.) At that time, plaintiff's other daughter worked as a care provider for her disabled sister. The agency initiated a fraud investigation based on evidence that plaintiff signed off on time-sheets for care provided by her other daughter billing more than 24 hours a day. (Tr. at 718.) Plaintiff claimed that she signed off only that services were performed, not as to the hours claimed, but the hearing examiner found that plaintiff understood how time-sheets were to be filled out yet continued to sign off on documents that over-billed. (Tr. at 720-21.) The court concluded that substantial evidence supported the hearing examiner's finding that plaintiff intentionally over-billed. (Tr. at 720.)

8

ALJ's decision. (Tr. at 1, 342.) The ALJ's decision now final, see Jeske, 955 F.3d at 587 n.2, plaintiff filed the instant action for judicial review.

## III. DISCUSSION

Substantial evidence supports the ALJ's key findings: that plaintiff applied for employment as a care provider for her daughter; that she was, in this position, expected to perform non-medical tasks beyond what family members normally do for one another; that she submitted payroll time-sheets documenting her work hours; that she received payments for her work well exceeding SGA levels throughout much of the disability period; and that she did not report this income to the SSA. Plaintiff does not contest the evidence underlying any of these findings.

Plaintiff raises four specific challenges to the ALJ's decision. I address each in turn.

### A. Medical Evidence of Disability

Plaintiff argues that the ALJ erred when she did not consider the medical evidence regarding her severe spinal impairment. (Pl.'s Br. at 3, 11, 12-15; Pl.'s Rep. Br. at 3-4.) As the ALJ correctly noted, however, once it was determined that plaintiff engaged in SGA during the relevant period, it was unnecessary to proceed to the remaining steps of the sequential evaluation process. (Tr. at 15.) The regulation clearly states: "If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience." 20 C.F.R. § 404.1520(b); see also Jones v. Shalala, 21 F.3d 191, 193 (7th Cir. 1994) ("If you are substantially gainfully employed, that is the end of your claim, even if you have compelling medical evidence that you really are disabled.").

9

## B. The Nature of Plaintiff's Work/Earnings

Plaintiff argues that the ALJ erred in rejecting the testimony of her witnesses about what she did and the law that allowed her to get paid for providing home care to her disabled daughter. (Pl.'s Br. at 4, 11, 15-27.) As indicated above, the ALJ considered the testimony from Nakita Neal, who served as the care provider for plaintiff's daughter during regular daytime hours. Neal stated that she never saw plaintiff provide any care for her daughter, but as the ALJ noted, Neal was "not present during the hours that IRIS is paying the claimant to act as a care provider and perform nonmedical tasks." (Tr. at 15.) Thus, Neal was in no position to testify as to what plaintiff did or did not do during her work hours. The decision to discount Neal's testimony cannot be deemed "patently wrong." See Stepp v. Colvin, 795 F.3d 711, 720 (7th Cir. 2015) (stating that the court will overturn an ALJ's credibility determination only if it is patently wrong); see also Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013) ("We will not . . . reweigh the evidence or substitute our judgment for that of the ALJ's.").

Plaintiff faults the ALJ for declining to hear testimony from the second witness she brought to the hearing, who would have verified that plaintiff did not take care of her disabled daughter. (Pl.'s Br. at 16.) The ALJ confirmed that this testimony would have been redundant of Neal's and reasonably required plaintiff to present one of her witnesses. See Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (holding that the ALJ did not need to consider redundant testimony); see also Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993) ("When reviewing proceedings conducted by others, district judges must respect the authority of administrative officials to decide how much is enough."). Plaintiff does not identify any additional facts the second witness could have presented.

Plaintiff does not otherwise challenge the ALJ's finding that her work was substantial and

10

gainful. The ALJ was not required to accept plaintiff's assertion she merely provided a home for her daughter, but no care. See Stepp, 795 F.3d at 720 ("[A]n ALJ is free to discount the applicant's testimony on the basis of the other evidence in the case.") (internal quote marks omitted); Fuchs v. Astrue, 873 F. Supp. 2d 959, 974 (N.D. Ill. 2012) ("[A]n ALJ is never required to accept a claimant's testimony as true.").

As the Commissioner notes, under the state program, family members have the right to choose care givers, and plaintiff chose to provide care herself when the daytime aide went home. (Tr. at 48, 683.) As plaintiff put it at the hearing, "I bill for those hours instead of hiring someone else to come in." (Tr. at 48.) And as the ALJ noted, under the program's rules, plaintiff could not be paid for things family members normally do for one another, such as laundry, cooking, supervision, and companionship. (Tr. at 15, 683.) Under the program, services that exceed typical family support include toileting, bathing, and transfer assists. (Tr. at 683.) While plaintiff downplayed her care duties, she did admit that "I try to change her pamper at night if necessary." (Tr. at 48.)

Finally, as the ALJ also noted, plaintiff generally received wages far above the amounts that presumptively establish work as SGA. (Tr. at 14-15.) It was reasonable for the ALJ to conclude that the agency would not pay plaintiff $4000-6000 per month to do nothing; indeed, program staff were supposed to monitor the services being provided for their appropriateness. (Tr. at 683.) Plaintiff was required by the agency to submit time reports documenting her work during each two-week pay period (Tr. at 685-88), with the sample time report in the record listing plaintiff as the "employee" (Tr. at 688). The ALJ found that plaintiff knew she was required to submit accurate time-sheets, in which hours of work reported reflected hours of work performed, following her daughter's 2014 dis-enrollment based on over-billing as

11

discussed in the state court decision. (Tr. at 15, citing Tr. at 717-23.)

Plaintiff contends that she received money for "habitation services," as defined in 42 U.S.C. § 1396n(c)(5)(A), under a program that pays for home and community-based attendant services and supports. (Pl.'s Br. at 16-27; Pl.'s Rep. Br. at 2-3.) Plaintiff discusses the purposes and requirements of this program, but she fails to explain how it relates to the issue before the ALJ. She cites no authority holding that a person paid to provide such services does not engage in SGA for purposes of social security disability benefits. Nor does she cite any authority for the proposition that earnings must be taxable to constitute SGA. Cf. 20 C.F.R. § 404.1572(b) ("Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized."). Nor does she contend she was ever told only taxable income must be reported to the SSA.

**C.     Evidence of Daughter's Foster Care Placement and Condition**

Plaintiff argues that the ALJ erred when she did not consider evidence from the agency and children's court records indicating that plaintiff placed her disabled daughter in foster care because she could no longer care for her due to her back impairment, but then took her out of foster care after she sustained injuries in the foster home. (Pl.'s Br. at 5-6, 11, 27-29; Pl.'s Rep. Br. at 3-4.) Contrary to plaintiff's suggestion (Pl.'s Br. at 28), the ALJ acknowledged that after her return to plaintiff's home the agency provided personal care workers to assist plaintiff's daughter given her significant needs. (Tr. at 15, 63.) The issue before the ALJ was whether plaintiff engaged in SGA by acting as one of her daughter's paid care providers. Why plaintiff took her daughter back into the home was not relevant to that determination. The extent of her daughter's disability and the nature of any injuries she suffered in foster care also did not bear

12

on the issue before the ALJ.[4]

**D.    Reopening**

Plaintiff argues that the ALJ erred by holding a hearing, which plaintiff did not request, after plaintiff received a favorable decision at the reconsideration level. (Pl.'s Br. at 6, 10-11, 29-31; Pl.'s Rep. Br. at 1-2.) Plaintiff cites 20 C.F.R. § 404.921, which provides that the "reconsidered determination is binding unless—(a) You or any other party to the reconsideration requests a hearing before an administrative law judge within the stated time period and a decision is made; (b) The expedited appeals process is used; or (c) The reconsidered determination is revised."

As the Commissioner notes, the ALJ held the hearing to give plaintiff a chance to tell her side of the story before revising the favorable 2015 decision; this was not a hearing to review a reconsideration determination from 2019. (Tr. at 261.) The ALJ reopened the decision on plaintiff's 2012 application pursuant to 42 U.S.C. § 405(u) and 20 C.F.R. § 404.988(c) based on evidence that plaintiff knowingly concealed material information. See Jaxson v. Saul, 970 F.3d 775, 776 (7th Cir. 2020) (noting that "redetermination is mandatory if there is reason to believe that fraud played a role"). The regulations provide that, if an ALJ proposes to revise a decision, and the revision would be based on evidence not included in the record on which the prior decision was based, the claimant will be notified in writing of the proposed action and of the right to request a hearing. 20 C.F.R. § 404.992(c); see also Jaxson, 970 F.3d at 777 ("The statutes do not prescribe procedures for redeterminations. The agency offered Jaxson

---

[4]As the Commissioner notes, the State of Wisconsin's determination that plaintiff's daughter needed an extensive level of full-time care is inconsistent with plaintiff's claim that she did not provide any meaningful services while getting paid thousands of dollars for the hours she billed each month. (Def.'s Br. at 17.)

13

an opportunity to have a hearing before an ALJ[.]"). The ALJ properly afforded plaintiff a hearing in this instance.

Finally, the decision to reopen was appropriate under the facts of this case.[5] It is undisputed that plaintiff failed to report her employment at SGA levels, which commenced at least one year before her hearing in August 2015. As the Commissioner notes, plaintiff was advised at various points during the process leading up to her August 2015 hearing of her obligation to report work activity. (Def.'s Br. at 18-19.) Plaintiff omitted her work as a care provider from her pre-hearing work background report submitted in December 2014, which specifically asked her to list "any work performed within the past 15 years" (Tr. at 551). Work activity was also the key issue at the August 2015 hearing, as the ALJ had previously decided to award benefits under the Grid as of plaintiff's 55th birthday, subject to clarification of a discrepancy in her earnings records. (Tr. at 81-83.) At that time, the ALJ stated that, once plaintiff amended the onset date, "I would restrict our hearing today to . . . verify there's no work in her background." (Tr. at 85.) Plaintiff testified that unexplained earnings that had previously appeared in her record were the result of identify theft (Tr. at 93), but she failed to mention that she had for the past year worked as a care provider, often earning thousands of dollars a month. She then sat silent while the VE identified just one past job, as a bus driver. (Tr. at 94.) And plaintiff's earnings were clearly material because the agency would have denied the application at step one had it known plaintiff was working at the SGA level.

---

[5]In reply, plaintiff contends that the reopening was arranged and directed by an Assistant United States Attorney after she could not institute criminal proceedings. (Pl.'s Rep. Br. at 4-7.) The issue before the court is whether the matter was properly reopened, not whether any particular government official may have requested it.

14

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The clerk shall enter judgment accordingly. Plaintiff's motions for an order reinstating her benefits, enjoining the collection of overpayment, and staying sanctions pending the court's decision on the merits (R. 25, 26, 49) are denied as moot.

Dated at Milwaukee, Wisconsin this 11th day of March, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge